NEW YORK PRACTICE REPORTS. 393

John Hancock Mutual Life Insurance Co. agt. Nichols.

## SUPREME COURT.

THE JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY agt. WILLIAM B. NICHOLS and GEORGIANA NICHOLS, his wife, JOSEPH O. HEGEMAN and JARED G. BALDWIN.

*Usury — Life insurance company loaning money on real estate and making an insurance upon the life of the borrower.*

It is not *usury* for an insurance company making a loan upon real estate, at the same time to make an insurance upon the life of the borrower or those of his friends.

*It seems* that this is so, although the taking of the policies was used as an inducement for making the loan, provided the policies were actually issued and the premium charged was the usual and fair premium.

*Kings Special Term, February,* 1878.

THE actions are brought for the purpose of foreclosing ten mortgages on ten adjoining houses and lots, situated in the city of Brooklyn, executed by the defendant Nichols and wife to the plaintiff, on the 29th day of September, 1874, each for the sum of $8,000, payable five years after date, with interest, semi-annually, at the rate of seven per cent per annum.

The defense interposed by the defendant William B. Nichols (the other defendants not having answered and being in default) is usury. The answer alleges, in substance, that out of the loan of $80,000 on the ten houses and lots above referred to, Nichols received the sum of $77,000 only, and that the plaintiff retained and reserved to itself the balance, to wit: The sum of $1,500, and in addition thereto $950 for the expenses of searching the title to the premises, and the sum of $550 for commissions for making said loans.

The facts are as follows : I. The plaintiff is a life insurance corporation, created and organized in 1862, under the laws of the state of Massachusetts. It has its principal place of business in the city of Boston.

II. In the early part of September, 1874, application was made to the plaintiff by the defendant William B. Nichols, for a loan. Such application was in writing on one of the company's usual printed blanks, and was signed by the defendant personally; and the written portions thereof were likewise in his handwriting. Such application is as follows:

## "APPLICATION FOR A LOAN OR MORTGAGE.

" Office of the John Hancock }
" Mutual Life Insurance Co., }
" Boston, Mass. }

" The subscriber proposes to the John Hancock Mutual Life Insurance Company *ten loans* of $8,000 *each* for *five* years, interest payable semi-annually at *seven* per cent per annum, upon the real estate described below:

Situation. — *Southerly side of Fulton Street,* 320$\frac{4}{12}$ *feet east of Classon avenue.*

Land. — Measuring 220 *ft.* on the street; extending back 117 feet, containing                       square feet, of which a diagram is annexed.

Value. — Valued at $              per square foot. Aggregate value, $80,000.

Buildings. — Materials, *brown-stone and brick.*

Size. — On *Fulton* Street. *Each* 22 feet, extending back 50 feet, of *three* stories *and basement.*

Value. — Valued at $12,000.

Estate. — Assessed value, $          . Cost, $          .

Occupation. — Occupied by                        .        ,
for              .

Rent. — Rented for $              per annum.

Note — Note to be signed by                    , and to be dated.

Insurance. — To be insured in such insurance company, and in such amount as this company shall approve.  *Now insured in the Continental Fire Ins. Co.*

Title. — The title to be examined, and the papers to be prepared by the solicitor of the company, at the expense of the applicant.

Remarks. —

Boston,          18  .

(Sd.)          *William B. Nichols,* applicant."

(The words printed in italics, and the figures are, in the original, in the handwriting of said Nichols.)

Such application was forwarded by mail through Mr. Gale, the district agent, in New York, of the plaintiff, to Boston, and there received by Mr. Bacon, the treasurer of the company.   The application was answered by letter as follows:

"Boston, September 7th, 1874.

"Wm. T. Gale, Esq., New York city:

"Dear Sir. — Mr. Bacon directs me to say, that we will loan $8,000 on each one of the ten stores in Brooklyn, and pay $50,000 as soon as the title is examined and papers signed — the title to be examined by Mr. B. W. Griswold, of the firm of Blatchford, Seward, Griswold & Da Costa, of 29 Nassau st., N. Y.; $30,000 in U. S. bonds to be deposited with the company as security that the buildings will be completed free from lien, and the balance of loan, $30,000, to be paid on completion.

"Truly yours,

"GEO. B. AGER,

"*Secretary.*"

Mr. Gale replied to this letter on September 9th, 1874, as follows:

"New York, Sept. 9th, 1874.

"Eben Bacon, Esq., Treas.

"Dear sir:

"I have seen Mr. W. B. Nichols, the applicant for the loan,

**396**    NEW YORK PRACTICE REPORTS.

John Hancock Mutual Life Insurance Co. agt. Nichols.

and he says he accepts your terms, only that he wants all the money ($80,000) now, to be paid as soon as the title is examined and papers signed. He deposits with the Co., Gov't. bonds to the value of $30,000 as security that the buildings will be completed free from lien. His broker told me he only wanted $30,000 now, but it seems he was wrong — for Mr. Nichols says, ' why should I deposit $30,000 Gov't. bonds unless I get the whole of the money ? ' and says you would have ample security for the whole — and the buildings will be finished about Nov. 1st.

" I have told him I will give him your answer by Saturday next, at the latest.

" Yours truly,

" (Sd.)    WM. T. GALE,

" *Dist. Agt.*"

To such letter Mr. Bacon responded as follows :

" Boston, 10th Sept., 1873.

" WM. T. GALE, Esq.

" Dear Sir :

" Yours of the ninth is received this A. M.

" I will be ready to pay the $80,000 upon completion of the examination of the title. If not already done, Mr. Nichols should give the deed of the property to Mr. Griswold and let him commence upon it at once. The conditions are as follows : $8,000 ea. on 10 stores, 5 years, @ 7 per cent. per annum, payable semi-annually, $30,000 U. S. Bonds to be placed in our hands as security that the building will be shortly completed free from lien.

" We generally date the loan from the date of application. If objection is made to this, can't you arrange it in some way ? Date it, if you can, September first ; if not, as soon after that as you can.

" We will pay the money at once upon hearing from Mr. Griswold that the papers are in order.

" Resp'ty,

" EBEN BACON, *Treas.*"

Such, then, was the contract between the parties. No question arises about the $30,000 United States bonds mentioned in the last letter, because, on the completion of the buildings, they were duly returned to Mr. Nichols.

III. The plaintiff forwarded to Mr. Griswold, its solicitor in New York, the sum of $80,000; and on the execution of the bonds and mortgages, Mr. Griswold paid to the defendant W. B. Nichols, including $200 paid for premium on fire insurance, the sum of........................ $77,000

Retained for his services and disbursements in
   searching the title........................... 950
And, by direction of Nichols, paid to Charles Whit-
   lock, his (Nichols') broker the remainder ...... 2,050

   Total.................................. $80,000

For this last mentioned sum of $2,050, Mr. Griswold drew, as requested by Whitlock, the broker, two checks, both to his order, one for $1,521.17, and the other for $528.83, and handed them to Whitlock.

It is true that Nichols tried to deny that he directed Mr. Griswold to pay the remainder to Whitlock; but the preponderance of evidence, and the fact that the checks would not have been so drawn without Nichols' instruction, irrespective of the contemporaneous memoranda made by Mr. Griswold in his check-book, is the other way. Mr. Griswold's testimony on this subject is further supported by the fact that, as he testified, Whitlock told him that he was employed by Nichols to *secure this loan;* that *in case he succeeded* in procuring the loan of $80,000 on these ten houses — $8,000 on each — *he was to receive* $3,000 *from Nichols, out of which he was to pay all the expenses of the loan,* title examination and every thing. Mr. Griswold is further corroborated by Mr. Harper, who testifies, in substance, that *Whitlock told him the same thing,* and substantially by Whitlock also. Nichols himself, on being recalled, testified, in answer to a

question propounded by his own counsel, as follows: "As Mr. Griswold was taking his check-book out to write the check, he says, 'I am to retain $3,000, am I not?' 'Yes, Mr. Griswold, *you are.*'" Or, as Whitlock testified: "Q. Why did Mr. Griswold give you the check for the balance, if Mr. Nichols wasn't there?" "A. Because Mr. Nichols told him that. He says, 'am I to reserve $3,000 of this?' 'Yes, sir.'" "Q. Is that all that was said?" "A. I don't know that that was all, but *he gave him to understand* that *three thousand was to be reserved* out of the $80,000. That was to go toward paying the expenses; *I don't know that he knew, or that Mr. Griswold knew all about it.*"

IV. Whitlock was employed by Nichols, as a broker, to effect the loan. He was neither directly or indirectly connected with, or employed by, the plaintiff. W. T. Gale was district agent of the plaintiff in the city of New York. His functions were limited "to procure life insurance, attend to the collection of premiums on policies as they became due, and remit to the company." Besides, his whole conduct and the correspondence clearly show that with the making of loans he had no concern. His compensation depended to a great extent on the life insurance he obtained, as he received a commission thereon, the company guaranteeing, however, that his income should not be less than $2,000 during the six months he was in their employment.

V. The plaintiff issued and delivered to Whitlock, policies of insurance on his own, his son's and some friends' lives, amounting to $37,000. The annual premium thereon amounted to $1,521.17, which Whitlock paid by handing to Gale, as agent for the company, one of the two checks which he had received from Mr. Griswold, as above narrated, first indorsing the same. Whether this check was handed to Gale by Whitlock in Mr. Griswold's office, or at his own office, is utterly immaterial, for Whitlock testified, as above alluded to, that he did not tell Mr. Griswold any thing about life insurance, *and that he,* Griswold, *knew nothing about it.* It is more

NEW YORK PRACTICE REPORTS. 399

John Hancock Mutual Life Insurance Co. agt. Nichols.

than likely, however, such being the remembrance of both Mr. Griswold and Gale, that the check was given to Gale in his office. It is true that Whitlock testified to the contrary, in fact, that he never received such check, never had it in his hand, did not know what name was to it. When the check, on being produced, appeared to be to his order, and bearing his indorsement, he had to admit that all his testimony given on that subject, *which he was as positive was as true as any other thing he had testified to*, was incorrect. The probabilities are that all the remainder of his testimony is equally incorrect.

VI. The rates of premium charged were the *usual, regular rates* of the company, and Gale declined to take less premium for the policies. At the expiration of the first year, Whitlock claimed that he was entitled to " paid-up policies." The president demurred thereto ; but it resulted in Whitlock receiving " paid-up policies " for a majority of the policies, making three paid-up policies, one for $500, and two for $250 each, total $1,000, *which he now owns ;* and the other policies, under the Massachusetts law, lapsing after *two* years from their date of issue, *though only one year's* premium had been paid. The plaintiff actually lost money by the issuance of the policies. Harper also gives the true report of the conversation that occurred between Mr. Thornton and Whitlock, a year after the issuing of the policies, when Whitlock demanded " paid-up policies." He contradicts Whitlock, and says what Mr. Thorton remarked was (as would be very natural to remark), that had the company known that these policies would suffer to be lapsed, or " paid-up policies " demanded after the first year, they would *not have issued the policies* of insurance, because a direct loss thereby resulted to the company. Mr. Harper distinctly says that *nothing* was said *about a mortgage.*

VII. It is claimed by the defendant that the procuring of these policies was exacted as a condition precedent to the loan being made. He and Whitlock testified in substance that

Gale, the district agent, told them that the application for the loan was refused, and suggested that he thought he could arrange it if they would take out policies, the premium of which would amount to about $1,500; that he was told to make such offer; and that subsequently they were informed that the company had accepted the offer; that Nichols, while acceding to the proposition, said to Gale, in Whitlock's presence, that the manner of issuing the policies he left entirely to Whitlock, and that he (Whitlock) could fix that up to suit himself. The story, as told by these two men, is contradicted by Gale, who states, in substance, that Whitlock was the person who first proposed the life insurance; that it is possible the company may have, at first, declined the loan, as to which he " does not remember," *but it had nothing to do with life insurance;* that the agreement concerning life insurance was one made between Whitlock and himself, *and had nothing to do with the company's making the loan;* for the making of the loan was not within his province, but only the obtaining of insurance on the premiums for which he earned a commission. The check of $1,521.17, which Whitlock indorsed and gave to Gale, was by him deposited in his bank account, as receipts for premiums, and it was by him credited in his general account with the company for and as such premiums.

If the defendant's story and theory be adopted, it is, of course, utterly immaterial with what specific check or money these premiums were paid, so long as such specific check or money did not, in law, belong to the defendant Nichols.

VIII. The defendant Nichols paid his interest for two years after the delivery of the bond and mortgage, to wit, up to the 29th day of September, 1876. Thereafter he ceased to pay the interest, and did not attempt to avail himself of the pretended defense of usury until foreclosure suits were instituted.

IX. The cause was tried on the 28th of December, 1877. On that day there was due, on each mortgage, the following sum:

| | |
|---|---:|
| Principal .................................. | $8,000 00 |
| Interest from September 29th, 1876, to date of trial ..................................... | 697 82 |
| Premium of insurance paid since the filing of the complaint ............................... | 12 00 |
| Total .................................... | $8,709 82 |

To which is to be added the sum of one dollar and fifty-three cents for interest for each day from the time of the trial until the decision.

*Charles M. Da Costa* and *C. A. Seward,* for plaintiffs.

I. The contract between the parties is found in the written application, prepared and signed by the defendant Nichols himself, and in the letters of the plaintiff's officers to Gale, their district agent in New York. No mention is anywhere therein made of life insurance. Being the written, expression of the parties at the time, it ought to prevail, on well-settled rules, over loose and contradictory oral statements by interested parties, especially when such loose and contradictory oral statements are invoked in favor of an unconscionable defense, interposed for the purpose of defrauding the plaintiff of the sum of $80,000. If, as it is confidently claimed, the preponderance of testimony shows that Nichols agreed to pay to Whitlock, his broker, the sum of $3,000 for procuring the loan, provided the broker would pay all the expenses out of such $3,000, then it is utterly immaterial to consider whether or not the plaintiff made it as a condition of the loan that Whitlock, the broker, should furnish them with life insurance, the premium of which would amount to about $1,500. It would be very difficult to cite any principle or any authority which made a contract

between A and B usurious, because A and C entered into an independent and mutually beneficial contract founded upon a valuable consideration. Any agreement between Nichols and Whitlock, his broker, by which the broker was to receive any amount of money for his services, does not render the contract between the plaintiff and Nichols usurious. Since *Condit* agt. *Baldwin* (21 *N. Y.*, 219) the question is no longer open to debate (*See Estevez* agt. *Purdy*, 66 *N. Y.*, 448, *where Condit* agt. *Baldwin and subsequent authorities are cited; and also Guardian M. L. Ins. Co.* agt. *Kasaw*, 66 *N. Y.*, 544).

Whitlock had certainly a right to insure in the plaintiff's company his own, his son's, and his friends' lives, receive the policies therefor, and pay the usual fair premium thereon. Such insurances were valid contracts between Whitlock and the company. He has held the company to them, and has had, and yet has, the benefit of them.

II. It has already been suggested that the only contract between the parties is the one evidenced by the written application and letters. If it be said that, from the parol evidence of Whitlock and Nichols on one side, and that of Gale on the other, the terms of the contract are to be gathered, yet, even then, as the defendant has the burden of proof, he has failed to establish the fact (as above more particularly referred to) that the application for the life insurance policies was made a condition by the plaintiff for making the loan.

It is plain to see that the head officials in Boston, who alone determined on the acceptance of the loan, knew nothing of any matter connected with the life insurance. The interest to effect that was specially with Gale, the district agent, who the more the premiums he got, the larger were his receipts from commissions thereon. Gale had, however, nothing to do with the effecting of the loan, save to carry out the instructions of his principals in Boston. There clearly was no intent on the part of the plaintiff to violate the usury laws, for their contract provided but for seven per cent, and such con-

tract, as accepted in writing, did not make the obtaining or non-obtaining of any life insurance policy a condition. It is equally clear that the company never gave and never intended to give Gale any authority to violate the usury laws.

Usury consists in taking more than seven per cent on a loan of money, in pursuance of a corrupt and unlawful agreement to that effect, made at the time by the parties to such loan. Without such corrupt and unlawful agreement there is no usury. The loose statements of what Gale said about the company being able to get eight per cent in Boston, as testified to by Whitlock, is contradicted by Gale. But even if true, the declarations of an agent with reference to a loan — when such agent had nothing to do with the making of loans, when his only functions were to obtain life insurance, collect the premiums and remit the same — would, under no rule of law, be binding on, or evidence against, his principal.

III. But assuming, for the sake of argument, and for that only, that application for life insurance policies, on which premiums to the amount of about $1,500 should be paid, was a condition precedent, or an inducement for making the loan, yet that would not sustain a defense of usury, provided, as appears in this case, the policies were actually issued and the premium charged was the usual and fair premium.

(*a.*) The statute against usury does not forbid the entering into of independent collateral contracts between parties, contemporaneously with or as a condition of the loan of money, provided such contemporaneous contracts be *bona fide*, and not fictitious, and thus a mere shift or device to evade the statute (*Utica Ins. Co.* agt. *Cadwell*, 3 *Wend.*, 296; *New York Fire Ins. Co.* agt. *Donaldson*, 3 *Edw. Ch.*, 199; *Brooklyn Bank* agt. *Warring*, 2 *Sand. Ch.*, 1; *Dondall* agt. *Lenox*, 3 *Edw. Ch.*, 267–275; *Bullock* agt. *Boyd*, *Hoffman's Ch.*, 294–299; *Fellows* agt. *American Life Ins. and T. R. R. Co.*, 1 *Sandf. Ch.*, 203; *Thomas* agt. *Murray*, 32 *N. Y.*, 605–612; *Beals* agt. *Benjamin*, 33 *id.*, 61; *Thurston* agt. *Cornell*, 38 *id.*, 281; *Valentine* agt. *Conner*, 40 *id.*, 248;

*Suydam* agt. *Westfall*, 4 *Hill*, 211; *Seymour* agt. *Marvin*, 11 *Barb.*, 80; *Cock* agt. *Flack*, 93 *W. S.*, 344).

(*b.*) But, while without authority in this state, the reports of England and New Jersey furnish direct precedents against the contention of the defendant.

In *Washington Life Ins. Co.* agt. *Paterson S. M. Co.* (10 *E. C. Green*, 160 [*N. J. Eq.*]) the facts were almost identical with those claimed by the defendant in this case. It was held that the requirement by the lender, a life insurance company, that the *borrower* should take out a policy of insurance as a condition of making the loan, was not, of itself, evidence of a usurious agreement (*See, also, Downes* agt. *Green*, 12 *Mees. & W.*, 481).

Similar doctrine, too, has been held in the case of annuities.

Thus a provision for insurance of the grantor's life does not make the grant of an annuity impeachable for usury (*Byrne* agt. *Kinnefeck*, 1 *Hogan*, 184; *French* agt. *Morgan*, *Batty*, 254; *Strong* agt. *Ormsby*, 2 *Hogan*, 59).

And in *Manly* agt. *Hawkins* (1 *Drury & Walsh*, 363) it was held that the circumstances of the repayment of the purchase-money being secured by an insurance on the life of the grantor, and the grantor having covenanted to pay the premiums did not bring the case within the statute of usury.

IV. Usury must be strictly proven as alleged, and any variance is fatal. Such has been the unbroken rule, both at law and in equity, from *Smith* agt. *Bush* (8 *Johns.*, 84), to *Wheaton* agt. *Voorhis* (53 *How. Pr. R.*, 319 *and cases there cited; see, also, Vroom* agt. *Ditmas*, 4 *Paige*, 526; *New Orleans G. L. & B. Co.* agt. *Dudley*, 8 *Paige*, 457, 458).

*Morris & Pearsall*, for defendants.

GILBERT, *J.* — I think the plaintiff is not bound by the conversation between Gale and Nichols and Whitlock. Nor can I give full credence to the version of that conversation,

John Hancock Mutual Life Insurance Co. agt. Nichols.

which was given by the latter. Assuming, however, that the evidence is sufficient to warrant the inference that the plaintiff refused to make the loan unless the defendant effected the insurance put in evidence by him, I think the transaction was not usurious for two reasons. (1.) The plaintiff gave *quid pro quo* for the premiums received. (2.) Whether the insurances would enable it to acquire the legal interest on the sum loaned, depended upon the contingency of the assured living for a period long enough to produce that result. It is not unlawful for a lender to refuse to lend to persons who are not his customers. The business of the plaintiff is to make insurances upon lives. It must invest its surplus funds. To confine its loans to its own patrons, is no more than the insisting upon fair reciprocity. There may be cases where the issuing of policies of life insurance is resorted to as a mere shift or device to cover up the real transaction which is an usurious one; but that is not the case here.

I think, therefore, that, upon principle as well as upon authority, the plaintiff is entitled to the usual judgment with costs ( *Washington Company* agt. *Paterson Company*, 10 *E. C. Green*, 160; *Down* agt. *Greene*, 12 *M. & W.*, 481; *Manly* agt. *Hawkins*, 1 *D. & Walsh*, 363.)